**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| BRYAN YOUNGE | ) | CIVIL ACTION |
| and | ) |  |
|  | ) | No.:_____ |
| SHELBY YOUNGE | ) |  |
|  | ) | JURY TRIAL DEMANDED |
| Plaintiffs. | ) |  |
|  | ) | COMPLAINT FOR DAMAGES: |
| v. | ) |  |
|  | ) | **1. CIVIL RIGHTS** |
| RYAN BERMAN, | ) | 42 U.S.C. §1983 |
|  | ) | Retaliation; |
| Defendant. | ) | **2. CIVIL RIGHTS** |
|  | ) | 42 U.S.C. §1983 |
|  | ) | Due Process; |
|  | ) | **3. DEFAMATION;** |
|  | ) | **4. TORTIOUS INTERFERENCE** |
|  | ) | **WITH CONTRACT;** |
|  | ) | **5. INTENTIONAL INFLICTION OF** |
|  | ) | **EMOTIONAL DISTRESS** |

## <u>COMPLAINT</u>

Plaintiff, Bryan Younge (hereinafter "Plaintiff") and Plaintiff, Shelby Younge (Plaintiff and Plaintiff Shelby Younge are hereinafter referred to collectively as Plaintiffs), by and through their undersigned attorneys, by way of this Complaint against Defendant Ryan Berman, Trustee of Village of Lakewood **(**hereinafter referred to as "Defendant"), sue Defendant for retaliation and due process violations of the Civil Rights Act, 42 U.S.C. § 1983, *et seq.* (the "Civil Rights Act"); and for common law defamation, tortious interference with contract and intentional infliction of emotional distress, and in support thereof, state the following:

**Nature of the Action**

1.      This action is commenced by the Plaintiffs against Defendant for (a) actual, consequential and punitive damages and other remedies authorized by 42 U.S.C. § 1983, *et. seq.*; and (b) for actual, consequential and punitive damages under Illinois law for defamation and tortious interference with contract, arising out of the Defendant's scheme to deprive Plaintiff of rights conferred on him by the United States Constitution and deprive Plaintiffs of rights conferred on them under the laws of the State of Illinois.

2.      As detailed herein, the Village of Lakewood experienced severe governing issues.[1] The board was essentially non-functional as a governing body, subject to the whims of the Defendant and Village President, Phil Stephan ("Stephan"). The workplace environment at the Village deteriorated to the point of absurdity, with multiple complaints by numerous employees of toxic behavior by certain trustees and Chief Administrative officer Jeannine Smith ("Smith"), including but not limited to harassment, discrimination and potential financial malfeasance.

3.      Plaintiff attempted to investigate and address the above cited issues relating to the working environment in the Village of Lakewood in an effort to prevent substantial liability from falling upon the Village. Given the nature of the allegations being made, particularly the conduct of Stephan, and Smith, the Village faced potential Federal & State liability under workplace anti-discrimination and anti-harassment laws.

4.      Furthermore, the Village Board and President consistently and repeatedly infringed on Plaintiff's rights and responsibilities as a Trustee, including denying him access to Village email, muting him while making comments during virtual Zoom board meetings, removing him

---

[1] https://www.nwherald.com/2020/06/20/past-present-lakewood-employees-allege-toxic-hostile-work-environment/abvzgsi/

completely from virtual Zoom board meetings, and refusing to allow him to vote on a measure brought before the Board. A majority of the Board acted in concert and Defendant was ultimately the ringleader of all of the issues concerning the Board of Trustees referenced in this Complaint.

5.    In a truly Orwellian-esque retaliation in response to Plaintiff's attempts to garner accountability for the Village's actions, the Board elected to refer *him* to the State's Attorney's Office for investigation using false allegations by *innuendo*, rather than, as one might expect, attempt to address the serious workplace harassment issues at home.

## The Parties

6.    Plaintiff is an Illinois citizen who resided, at all material times herein, in the Village of Lakewood, IL. At times relevant herein, Plaintiff was a Trustee of the Village of Lakewood Board of Trustees, appointed for a term from June of 2019 to May of 2021.

7.    Plaintiff Shelby Younge, is an Illinois citizen who resided, at all material times herein, in the Village of Lakewood, IL.

8.    Defendant Ryan Berman ("Berman"), is a Trustee of the Village of Lakewood ("Lakewood"), and is an adult individual with a work address of 1700 N Penny Ln, Schaumburg, IL 60173 and a residence of 6615 Woodland Hills Drive, Village of Lakewood, IL 60014.

## Jurisdiction and Venue

9.    This Court has subject matter jurisdiction under 28 USC § 1331, on the basis of there being a federal question relating to the U.S. Constitution. *See Bivens v. Six Unknown Narcotics Agents*, 403 U.S. 388 (1971).

10.    This Court also has subject matter jurisdiction under 28 USC § 1331, on the basis of there being a federal question relating to 42 USC § 1983.

11.    Venue is appropriate because Defendant, all affiliated with the Village of Lakewood, are within the district boundaries for this Court.

3

4349960 v1 -

12.     This Court also has supplemental jurisdiction over the Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because they are so related to the claims in the action within such original jurisdiction of this Court that they form part of the same case or controversy under Article III of the United States Constitution.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the Partners' claims occurred in this District.

### Facts Giving Rise to Action

14.     The government's structure and operation are described on the Village of Lakewood's website:

> The Village operates under the President-Trustee form of government.  The Village Board is comprised of a President (or mayor) and six Trustees who are underlined elected on a non-partisan, at-large basis for staggered four-year terms. The Village Clerk, Treasurer, Attorney, and Village Manager are appointed by the Board.  The Village Board is the community's policy-making body and has created a variety of advisory boards and commissions on which citizens can volunteer to participate.  The day-to-day operations of the Village are administered by full-time professional staff.

https://www.village.lakewood.il.us/index.asp?SEC=CD8A08ED-1DB4-415B-A587-B75BAAA93223&Type=B_BASIC .

15.     Plaintiff was appointed as a Trustee with the advice and consent of the Village Board at the Board's June 25, 2019, meeting.  All Trustees voted in favor, none opposed.  See board packet for June 25 meeting, see minutes:  Board_Meeting_7-9-19.pdf (lakewood.il.us))  As a result, Plaintiff's term was only the remainder of a term that was vacated by a former Trustee Stephan.

16.     Trustees Pamela Eddy ("Eddy"), and Stephan were also elected to two-year terms as Trustees of Lakewood, whereas the rest of the trustees were elected to four-year terms.

17.     Lakewood Trustees earn a monthly stipend in the amount of $1200.00 (Lakewood Trustees "shall each receive the sum of $1,200.00, payable in monthly installments." Lakewood Village Code § 2.10(2)).

18.     Removal of officers is governed by Section 3.07 of the Village Code. Trustees are not officers, however, and there is no procedure in the Village Code for the removal of Trustees by impeachment, termination, or any other procedure.

19.     After joining the Board of Trustees for the Village of Lakewood, during an executive session of the Board in April 2020, Smith reported an incident at the Village offices whereby Police Chief Todd Richardson ("Richardson") purportedly raised his voice and was aggressive toward Village employees. It was Smith's intention to obtain authority to fire Richardson.

20.     In response to the discussion held during the Board meeting, Plaintiff visited the Village offices to determine the efficacy of Smith's recommendation. During that visit, Plaintiff spoke to a number of employees and discovered a toxic work environment and apparent inappropriate conduct engaged in by Smith and supported by certain Village Trustees, including Stephan and Defendant.

21.     Communications and events on the Lakewood Board of Trustees then became contentious and the discord remained over the last year and a half of Plaintiff's tenure. It appears to have commenced when Plaintiff authored a five-page email May 6, 2020 sent it to fellow Trustees Augustine, Berman, Eddy, and Odom in which he outlined incidents in which Chief Richardson became vocal and slammed doors, which Richardson told Plaintiff was due to a deeply toxic work environment caused by Stephan and Smith.

4349960 v1 -

22.     The tipping point of the discord at the Village occurred on May 4, 2020.  Plaintiff undertook an investigation to determine the efficacy of the complaints lodged by Richardson and it certainly appears that President Stephan and CAO Smith have caused a deeply toxic work environment. Plaintiff interviewed over twenty Village employees who substantiated the complaints of Richardson that the Village work environment was toxic and that Smith was the ringleader and was regularly abetted by Stephan. Moreover, it was discovered that Smith had been deleting documents relating to her work at the Village.

23.     Plaintiff was driving to the Village offices on the morning of May 4, 2020 and called a quorum of the Board, including Amy Odom, Brian Augustine and Pamela Eddy, who agreed that Plaintiff should continue his investigation into the work environment at the Village offices and terminate Smith's access to the computer system.

24.     When Plaintiff arrived at the offices, his intent was to terminate Smith's access to the computer system at the office so that she could no longer destroy information.

25.     Prior to Plaintiff's departure the morning of May 4, 2020, the Village employees were fearful of retaliation from Smith and/or Stephan and expressed grave concern that there would be rampant retaliation if Plaintiff were to leave the office that morning.  Plaintiff asked those employees to contact him if any trouble from Smith or Stephan that morning.

26.     Within minutes, the Village employees texted Plaintiff and asked him to return. Upon return to the office, Plaintiff was confronted by Stephan who physically assaulted Plaintiff and threatened him with bodily harm. The circumstances became substantially more chaotic Richardson decided to contact the McHenry County Sherriff to intervene.

27.     On two occasions, Plaintiff was threatened by Phil Stephan who stated: "Let's go motherf___er."

6

28. The Village attorney instructed Plaintiff to prepare a memorandum of his findings and submit it to the Board in 48 hours to comply with the Open meetings Act.

29. Plaintiff's investigation commenced after the April 28, 2020 board meeting when Plaintiff and Brian Augustine took the initiative during Executive Session to reach out to Chief Richardson to get more details about the Village environment. Richardson reported that his outbursts were based on his frustrations about having to work continually in a "deeply toxic" work environment and the undue pressure by both Stephan and Smith to carry out self-serving, unethical, and even illegal activities that would compromise the integrity and safety of our officers, as well as expose the village to lawsuits (which happened).

30. Richardson's outburst was not about budget matters as Smith had portrayed during executive session.

31. Plaintiff interviewed every village employee that was present at the time of Todd's outburst and inquired if the outburst made him or her feel uncomfortable or led them to question Richardson's state of mind at any point. All said no. They understood that in the most recent confrontation last Tuesday, Todd's elevated voice was so that there would be witnesses.

32. Richardson encouraged Plaintiff to reach out to other village employees to get unfettered and objective perspectives of what is really going on at Village Hall and at RedTail.

33. Plaintiff conducted additional interviews with current and past employees and it became clear that Richardson 's concern was legitimate, and both Stephan and Smith's conduct towards employees and in some circumstances village matters became deeply disconcerting.

34. Every single village employee, current and past, during Plaintiff's inquiries with them, confirmed that the work environment under Smith and Stephan is perceived as "highly toxic," "hostile," "violent," "harassing," "sexually harassing," and "sketchy".

7

35.     Multiple employees were told that they were not permitted to speak to board members. Under fear of being terminated, Village employees were left with nowhere to go. There was no system in place to file grievances.

36.     Of equal concern, by way of interviews, emails and documents, Plaintiff discovered that budget and other matters may have been carried out surreptitiously and hidden from and/or re-characterized for, the Board.

37.     Some employees witnessed Ed Kisman's resignation letter being shredded by Smith, which was admitted on voice record during the May 6, 2020 special meeting. More than one witness observed Smith deleting emails on other employees' computers to which she apparently had access. Most interviewees indicated they were constantly in fear of losing their jobs, and that stress (even before COVID-19) levied by Stephan and Smith is more than they have ever experienced in their careers.

38.     A 360-degree employee evaluation was completed by the majority of village employees, rendering a net promoter score of (minus) -100%, in that every single respondent would not recommend Smith to a colleague.

39.     When Plaintiff reported back to Stephan after his conversation with the Chief Richardson, Plaintiff indicated he still had a few phone calls to make but that Richardson was fine and calm.

40.     When Plaintiff told Stephan that Plaintiff's concerns shifted away from Richardson and toward the treatment of employees, Stephan responded "I didn't authorize you to call any other employees. Todd cannot "mother f__k" people. This is about Todd, not me. He simply cannot mother f__k."

8

41.     Ultimately, Plaintiff interviewed 27 representatives, employees, past employees and one golf member. Plaintiff kept detailed contemporaneous notes and dozens and dozens of pages of testimony indicating a toxic culture that is in a state of crisis.

42.     Plaintiff also expressed serious concerns about the treatment of Village employees by both Stephan and Smith. Furthermore, Plaintiff highlighted certain actions, including but not limited to, how money has been handled with certain projects (the deck at RedTail, a concentration of aesthetic and expensive projects within eyesight of the president's house), the matter with filling up the lakes with municipal water without going through the proper channels, mischaracterizing the event at the next board meeting and after the fact, stonewalling FOIA inquiries, and jeopardizing the safety of the community by having depleted water below levels safe enough for firefighting. Plaintiff contacted McHenry County's head Sheriff, Bill Prim, with these concerns which were ultimately escalated to a formal and detailed investigation under the purview of a Grand Jury.

https://www.dropbox.com/s/wwyg5bzyathp590/Sheriff%20Grand%20Jury%20Investigation.pdf?dl=0

43.     At one point, Stephan arrived in a fury when he heard from Smith that Plaintiff was making copies of personnel files. He noticed that all of the employees were huddled in the police section of the building because of the way Stephan and Smith stormed in. Stephan actually arrived in a very reckless manner in his vehicle skidding around the corner and coming to a screeching halt after aiming for Richardson's police cruiser to force a dangerous stop, picked up on Richardson's dash cam. Following this, Stephan went on a tirade that was also picked up on chief Richardson's dash cam where Stephan can be heard openly and loudly spewing remarks about

Plaintiff being at the village hall making copies of personnel files, about having police matters handled by dispatch, and an act of aggravated assault towards Richardson.

44.     In this video, Smith can be heard asking why they were huddled. Trustee Doug Ulrich's response, before having any idea what the situation is and without speaking to a single employee: "Well, it'll be fixed soon. It will. Good thing we got that many people unemployed. Staff can be replaced... Just put everybody on unpaid leave...". You could hear the whispering of the employees about how mortifying this remark was coming from a trustee.

45.     A few minutes after this point, Plaintiff confronted Ulrich and asked him why he is kowtowing to Stephan and if he has any idea what the culture is like at the Village Hall. His response was "it's fine, it's great". Evidently, the culture of treating employees as if they are worthless and dispensable seeped into the board of trustees.

46.     Stephan then became aggressive with Plaintiff in front of the Village Attorney, Michael Smoron, bumped into Plaintiff's back with his chest, clinched both fists and said "go for it motherf__ker." Ulrich, who was outside of the room, came in when he heard this and alleged that Plaintiff shoved him and directed the sheriff to have Plaintiff arrested.

47.     There was no such incident. The sheriff confirmed that with Smoron which is stated in the Sheriff's incident report. Later in the parking lot, still upset from Stephan's aggression towards everybody and Plaintiff, Plaintiff told Stephan never to shake his fist at me again, to which point he once again became aggressive and attempted to coax a fist fight, saying "let's square off. Come on let's go." These actions were affirmed by Augustine at the May 6, 2020 executive session, which was recorded.

48.     The following circumstances came to light following Plaintiff's investigation as reported in his May 6, 2020 memorandum:

10

1. **Neglect for the safety of our police officers.** Stephan and Smith repeatedly violated non-emergency protocols by not going through dispatch and frequently sent officers on pet errands, threatening to fire officers if they did not carry out frivolous janitorial tasks, not writing frivolous citations for people they did not like, and then telling them to ignore legitimate or similar violations for people they do like.

2. **Sexual harassment.** According to documentation collected, Stephan has been heard by many people in RedTail disparaging women and making a variety of misogynistic comments. Smith frequently discusses sexual matters in front of staff as well. Stephan reportedly texted a picture of a female bartender at night through a security camera and said "I'm watching you LOL". It made the bartender nauseous and worried for her safety.

3. **Sexual discrimination.** Stephan indicated his desire to fire Don and hire female bartenders to "keep men in there longer and spending money." Same with the beverage cart operator. Needs to be "a pretty young girl."

4. **Active cultivation of a hostile work environment.** Partially summarized above but many other incidents documented for both Stephan and Smith that displayed hostility toward purported enemies.

5. **Making misrepresentations to the board on matters of budget, projects, and safety and other violations.** Numerous documents demonstrated misinformation regarding municipal water ejection into ponds, stonewalling inquiries about that ejection, sources and uses of funds for RedTail deck, related permit violations, related general ledger entries, purported donations from the operating budget to fund the work, a suspicious +/-$67,000 fertilizer budget.

6. **Destruction of documents related to Village matters.** Discussed above.

7. **Incendiary and defamatory remarks about current and past employees.** Too many to list, many are in the documentation. Stephan told at least one employee that the trustee asking questions was high on marijuana and other falsehoods possibly in an effort to undermine the gathering of information.

8. **Repeated abuse of power, often for personal gain.** The village's most expensive aesthetically related projects have been within eyeshot of Stephan's home: The paving of Muirfield Drive (other streets are in much greater need of repair), various projects to RedTail clubhouse, irrigation and fire burns next to his house, useless silo renovation project right behind his house. Stephan and Smith wield unwarranted power to intimidate, harass and belittle individuals.

9. **Legal cost risk to the community**. Based on the testimonials, Plaintiff expressed concern that additional legal matters will be forthcoming. Stephan is a named party in multiple filings of late, both criminal and civil. He does not seem to have a sound mind frame to detect and avoid these risks.

49. The Village attorney indicated on May 4, 2020 that the items revealed by Plaintiff's investigation and itemized in his subsequent memorandum of May 6, 2020 would be addressed at the next Board meeting in executive session. The opportunity to enter into executive session at the next board meeting was intentionally thwarted by the President and Defendant; as such, that discussion never occurred.

50. Notwithstanding the above sequence of events and in retaliation for Plaintiff's efforts to uncover the misconduct of certain other Trustees, the Village Board, in a 5-1 vote (whereas Stephan replaced himself as a voting member in place of Plaintiff, thereby denying Plaintiff the right to vote in the measure) authorized that a July 24, 2020, letter (page 9 in this document:

https://www.dropbox.com/s/m4ijjlha1xyfjl0/FOIA%2CResponse%2C%20signed%20SA%20lett er.pdf?dl=0 ) from Stephan, sent on behalf of the Board of Trustees, to Patrick Kenneally, the Illinois State's Attorney for McHenry County, requesting an investigation into whether Plaintiff's actions in investigating the conduct of Smith and Stephan constituted stalking or harassment under the Illinois Criminal Code. The letter includes a prominently-presented list of purported crimes committed by Plaintiff including doxing, physical threats, and other allegations that are known by Defendant to be false.

51. The Board's allegations received substantial coverage in the press: *see, e.g.,* Cassie Buchman, *Lakewood Village Board Asks for Criminal Investigation into Trustee for Harassment*, NORTHWEST HERALD (Aug. 20, 2020), available at: Lakewood Village Board set to vote on

harassment investigation regarding trustee – Shaw Local  and  Lakewood Board Retaliates against Trustee Bryan Younge for Defending Village Employees - McHenry County Blog and Lakewood Village Board asks for criminal investigation into trustee for harassment – Shaw Local)

52.   The Lakewood Meeting Agenda for the July 28, 2020 meeting reveals that a Motion Directing Chief Administrative Officer Jeannine Smith to Not Respond to and to Disregard Any and All Communication from Trustee Plaintiff was made.

53.   At that hearing another Motion was made to Authorize Investigation of Plaintiff for Harassment. *See*, Lakewood Agenda at 2 (July 28, 2020).

54.   The June 9, 2020, Meeting Minutes contain a discussion about Plaintiff supposedly being kicked out of the May 26, 2020, Zoom meeting.  This issue was rejected by Defendant pointing out that Plaintiff had the ability to commandeer his wife's Zoom feed. Defendant routinely used Trustee Comments during board meetings to levy threats and ridicule against Plaintiffs. There was no opportunity for Plaintiffs to comment or set the record straight as their Zoom audio were always muted.

55.   On or about August 5, 2020, the chief of police Todd Richardson was put on administrative leave pending an investigation even though he has whistleblower protections because he is the one who brought light to the toxicity in the government.  And in an apparent synchronized ambush, Plaintiff's Village of Lakewood email was terminated without notice. There is no evidence of Board action, motion or other procedural device that was employed prior to that action being taken by the Board.

56.   Defendant sent multiple harassing emails to Plaintiff's wife, Plaintiff Shelby, in an effort to discourage speaking out against the Board and its President. On at least one occasion, Defendant authored a private, one-on-one email to Plaintiff Shelby that was unsettling to her.

Defendants commissioned an attorney to deliver a cease-and-desist letter demanding all communications to Plaintiff's family to stop. Defendant openly ignored this demand.

57. Plaintiff was severed from any access to files, staff and has been rendered *persona non grata* by the majority of the remaining Board members.

58. In the June 23, 2020, Village of Lakewood, Board of Trustees, *Majority Report on the Matter of Personnel Issues Relating to CAO Jeannine Smith and President Phil Stephan* (p. 67 of Bd. Mtg. Mins, 7-28-20), it was *falsely* written: "Trustee Bryan Younge attempted to terminate CAO Jeannine Smith." This remark refers to the McHenry County Sheriff incident report, in which the Plaintiff reports no statements whatsoever about terminating CAO Smith. The intention was to remove Smith's access to the network per an earlier-established quorum.

59. The lengthy Board Meeting Minutes reveal a Majority Report on the Matter of Personnel Issues Relating to CAO Jeannine Smith and President Phil Stephan (p. 66). That Majority Report writes about Plaintiff's "roadmap" email sent May 6, 2020:

- Step I of his plan consisted of an unveiled threat to weaponize the FOIA process to force out the CAO, Village President, and Trustee Doug Ulrich. Specifically, his email states:

- Tender resignations of Phil, Jeannine and Doug at the meeting. Documents will be prepared and present, needing only signature. Cite risk of FOIA. If they refuse, exit this roadmap and move to next plan. If yes, continue to (2).

60. President Stephan on behalf of the Board of Trustees and at the recommendation and behest of Defendant, sent a letter dated July 24, 2020, to Patrick Kenneally, Esq., the Illinois State's Attorney, requesting that it investigate whether Plaintiff's actions constitute stalking or harassment under the Illinois Criminal Code. Twenty exhibits were attached to that letter, some of which were materially altered.

61.     In addition, on information and belief, Defendant mailed a "dossier" of materials via USPS, including documents that were fraudulently altered, relating to events at the Village and the circumstances of Village discord, anonymously, to Plaintiff's employer, Newmark Knight Frank (Newmark) on several occasions to jeopardize Plaintiff's employment and interfere with his employment contract.

62.     As mentioned, Defendant was the ringleader of the effort to victimize Plaintiff, attack him and Plaintiff, Shelby Younge, and deprive Plaintiff of his civil rights and otherwise cause Plaintiff's damages.

63.     Since Plaintiff left the Board of Trustees, he has learned that:

a.  Defendant is a convicted felon and has been arrested for identity theft;

b.  Defendant was sued for breach of contract and for misrepresenting the nature of his position at his current company;

c.  Defendant accused Plaintiff of voter fraud by forging Plaintiff's and his wife, Plaintiff Shelby Younge's signatures, along with forging the signatures of more than 60 other residents, involving a petition for the 2021 Board of Trustee election. He filed the petition before he even had access to a sufficient number of signatures;

d.  Defendant threatened Plaintiff and actually sent a document preservation notice during a Board of Trustee meeting; Defendant failed to give Plaintiff an opportunity to respond and, when Plaintiff's spouse, Plaintiff Shelby, responded, they muted her mid-sentence.

64.     In addition to the "dossier" that was sent to the CEO and to an executive of Newmark, another one was sent again shortly thereafter to the same individuals anonymously.

65.     In addition to the media coverage Plaintiff endured, Defendant authored an Op Ed that was published, laden with false information about Plaintiff.

66.     As part of Defendant's campaign of harassment, Defendant also sent an email to Plaintiff indicating that Defendant "PWNED" Plaintiff, a term suggesting Defendant had hacked into Plaintiff's email account. Such an email caused all manner of emotional distress and security uneasiness in Plaintiff's family.

**Count I**
**Section 1983 – Plaintiff v. Defendant**
**Retaliation**

67.     Plaintiff realleges and incorporates herein by reference the allegations contained in

preceding paragraphs of this Complaint numbered 1 through 66 as part of this cause of action.

68.     Plaintiffs are suing Defendant in his individual capacity only.

69.     Title 42, Section 1983 of the United States Statutes provides a remedy to Plaintiff

to vindicate a violation of his constitutional rights.

70.     Plaintiff is entitled to recover damages when:

(a)     A person who,

(b)     under color of any statute, ordinance, regulation, custom, or usage, of any
State or Territory or the District of Columbia,

(c)     subjects, or causes to be subjected,

(d)     any citizen of the United States or other person within the jurisdiction
thereof to,

(e)     the deprivation of any rights, privileges, or immunities secured by the
Constitution and laws,

(f)     shall be liable to the party injured in an action at law, suit in equity, or other
proper proceeding for redress. …

42 U.S.C. § 1983.

71.     When First Amendment rights are violated, a wrong has clearly been committed

and a Section 1983 claim exists.

72.     Moreover, when a government employee suffers retaliation for exercising his first

Amendment rights, a wrong has clearly been committed and a Section 1983 claim exists.

73.     In retaliation for Plaintiff's Memorandum dated May 6, 2020, Defendant sought to

curtail Plaintiff's First Amendment rights by shutting Plaintiff out of meetings, having his email

16

shut down, issuing various censures during board meetings, and other actions that prevented him from carrying out his duties as Trustee and/or participating on Board functions.

74.     When a public employee claims that her employer made an adverse employment decision because of the employee's speech, three legal issues are central: (1) whether the speech was pursuant to the employee's official duties; (2) whether the speech was a "matter of public concern"; and, if the speech was not pursuant to official duties and was a matter of public concern; (3) whether the employee's speech interest outweigh the government's interest in effective governmental operations.

75.     The May 6, 2020, email was clearly a statement made pursuant to Plaintiff's position as a Trustee, it was clearly a matter of public concern, and the importance of what Plaintiff wrote about clearly outweighed whatever governmental interest there might be in shutting him down.

76.     Because the actions taken by Defendant over the course of the next several months to accomplish this goal have been in response to Plaintiff's May 6, 2020, email (both during Plaintiffs tenure as a Trustee and after the tenure as a citizen and resident of the community) it constitutes a retaliatory quashing of Plaintiff's First Amendment rights by someone acting under color of state law.

WHEREFORE, Plaintiffs demand judgement in their favor and against Defendant, together with any and all compensatory and punitive damages, costs, fees, and attorneys' fees as allowed by law.

**Count II**
**Section 1983 – Plaintiff v. Defendant**
**Due Process Violation**

77.     Plaintiff reincorporates the allegations of paragraphs 1 through 76 as if set forth herein at length.

78.     Plaintiffs are suing Defendant in his individual capacity only.

79.     The actions of Defendant, in falsely accusing Plaintiff of harassment and stalking, without any probable cause, investigation or notice and opportunity to defend, violated Plaintiff's right to due process.

80.     For "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential. *Wisconsin v. Constantineau*, 400 U.S. 433, 437.  *Wieman v. Updegraff*, 344 U.S. 183, 191; *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123; *United States v. Lovett*, 328 U.S. 303, 316-317; *Peters v. Hobby*, 349 U.S. 331, 352 (DOUGLAS, J., concurring). *See Cafeteria Workers v. McElroy*, 367 U.S. 886, 898.

81.     Because Plaintiff's position as a Trustee is a paying position, he has a due process right (*i.e.*, a property right) in his employment.  He was constructively discharged from his position by the actions of the Defendant.

82.     Defendant personally, maliciously, and under color of state law deprived Plaintiffs of Plaintiffs' rights under the First Amendment to the United States Constitution, which are secured through the Fourteenth Amendment, by maliciously retaliating against Plaintiffs for Plaintiffs' exercise of the constitutional right of free speech to protest government activity of great public interest of which Plaintiffs disapproved and protested peacefully without interfering with the State's operations.

18

4349960 v1 -

83.     In depriving Plaintiffs of these rights, Defendant committed these unlawful violations under color of state law in bad faith and with malicious purpose in reckless, wanton, and willful disregard of Plaintiffs' human, safety, and property rights.

84.     This deprivation under color of state law is actionable under and may be redressed by 42 U.S.C. §1983.

85.     Plaintiff has suffered damages as a result of Defendant's actions.

WHEREFORE, Plaintiffs demand judgement in their favor and against Defendant, together with any and all compensatory and punitive damages, costs, fees, and attorneys' fees as allowed by law.

**Count III**
**Plaintiff v. Defendant**
**Defamation**

86.     Plaintiff reincorporates the allegations of paragraphs 1 through 85 as if set forth herein at length.

87.     Plaintiff is informed and believes, and based on that information and belief alleges, that at all  times mentioned in this complaint, Defendant mailed a "dossier" of materials ("Package"), via USPS, including documents that were fraudulently altered, relating to events at the Village and the circumstances of Village discord, anonymously, to Plaintiff's employer, Newmark on several occasions in an effort to jeopardize Plaintiff's employment and interfere with his employment contract.

88.     Each Package referred to plaintiff by name throughout, was made of and concerning plaintiff, and was so understood by those who read the publication.

89.     The entire statements contained in each Package are false as it pertains to Plaintiff.

4349960 v1 -

90.     The publication of each Package was made in retaliation for Plaintiff performing his duties as a Trustee while a Trustee and for peacefully protesting while a citizen and resident of the community, and for no other purpose.

91.     Each Package is libelous on its face. It clearly exposes plaintiff to hatred, contempt, ridicule and obloquy because it states facts which show statement is libelous on its face, for example: it charges plaintiff with having committed multiple crimes.

92.     The publication of each Package was seen and read on or about March 7, 2021 and thereafter by representatives of Newmark.

93.     As a proximate result of the above-described publication, plaintiff has suffered loss of his reputation, shame, mortification, and injury to his psychological state, all to his damage in an amount to be established by proof at trial.

94.     The above-described publication was not privileged because it was published by Defendant with malice, hatred and ill will toward plaintiff and the desire to injure him, in that Defendant had expressed a desire to "get" plaintiff. Because of Defendant' malice in publishing, plaintiff seeks punitive damages in an amount to be established by proof at trial.

WHEREFORE, plaintiff demands judgment against Defendant, and each of them, for:

1.      Compensatory damages according to proof;

2.      Punitive damages;

3.      Interest as allowed by law;

4.      Costs of defense for potential criminal-related matters;

5.       Costs of suit; and,

6.      Such other and further relief as this court may deem just and proper.

WHEREFORE, Plaintiffs demand judgement in their favor and against Defendant, together with any and all compensatory and punitive damages, costs, fees, and attorneys' fees as allowed by law.

### Count IV
### Plaintiff v. Defendant
### Tortious Interference With Contracts

95.         Plaintiff reincorporates the allegations of paragraphs 1 through 94 as if set forth herein at length.

96.         To state a claim for tortious interference with contract under Illinois law, Plaintiff must allege:

(1)         the existence of a valid and enforceable contract between the plaintiff and another party;

(2)         that the defendant was aware of the contractual relationship;

(3)         an intentional and unjustified inducement of a breach of the contract by the defendant;

(4)         the subsequent breach of the contract by the other party, caused by the defendant's inducement; and

(5)         damages." Williams v. Shell Oil Co., 18 F.3d 396, 402 (7th Cir. 1994).

97.         Illinois law also makes clear that "any tortious interference by a defendant . . . must be directed toward the third party, not the plaintiff." *LaSalle Bank Nat'l Ass'n v. Moran Foods, Inc.*, 477 F. Supp. 2d 932, 939 (N.D. Ill. 2007).

98.         In other words, the claim must be "premised on acts immediately directed at a third party which cause that party to breach its contract with the plaintiff." *George A. Fuller Co. v. Chicago Coll. of Osteopathic Med.*, 719 F.2d 1326, 1331 (7th Cir. 1983).

21

99.     Plaintiff is informed and believes, and based on that information and belief alleges, that at all times mentioned in this complaint, Defendant mailed each Package, including documents that were fraudulently altered, relating to events at the Village and the circumstances of Village discord, anonymously, to Plaintiff's employer, Newmark on several occasions in an effort to jeopardize Plaintiff's employment and interfere with his employment contract.

100.    Each Package referred to plaintiff by name throughout, was made of and concerning plaintiff, and was so understood by those who read the publication.

101.    The entire statements contained in each Package are false as it pertains to Plaintiff.

102.    The publication of each Package was made in retaliation for Plaintiff performing his duties as a Trustee and for no other purpose.

103.    Each Package is libelous on its face. It clearly exposes plaintiff to hatred, contempt, ridicule and obloquy because it states facts which show statement is libelous on its face, for example: it charges plaintiff with having committed a crime.

104.    The publication of each Package was seen and read on or about March 7, 2021 and thereafter by representatives of Newmark.

105.    Defendant sent each Package to Newmark in order to interfere with Plaintiff's employment contract with Newmark. As a proximate result of the above-described publication, plaintiff has suffered loss of his reputation, shame, mortification, and injury to his feelings, all to his damage in an amount to be established by proof at trial.

106.    The above-described publication was not privileged because it was published by Defendant with malice, hatred and ill will toward plaintiff and the desire to injure him, in that Defendant had expressed a desire to "get" plaintiff. Because of Defendant' malice in plaintiff seeks punitive damages in an amount to be established by proof at trial.

WHEREFORE, Plaintiffs demand judgement in their favor and against Defendant, together with any and all compensatory and punitive damages, costs, fees, and attorneys' fees as allowed by law.

**Count V**
**Plaintiff v. Defendant**
**Intentional Infliction of Emotional Distress**

107.    Plaintiff reincorporates the allegations of paragraphs 1 through 106 as if set forth herein at length.

108.    Under Illinois law, physical manifestation of emotional distress is not an element of the tort of intentional infliction of emotional distress.

109.    Under Illinois common law the tort of intentional infliction of emotional distress comprises three elements.

A.    First, the conduct involved must be truly extreme and outrageous;

B.    Second, the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress;

C.    Third, the conduct must in fact cause severe emotional distress. A plaintiff need not allege physical injury to recover for intentional infliction of emotional distress.

110.    The matters alleged in paragraphs 21 through and including 61, and in particular, those matters averred in paragraphs 61 through and including 66 are incorporated by refence herein and  realleged herein.

111.    Defendant's actions were designed to inflict severe emotional distress upon Plaintiffs.

112.    Defendant knew that there was a high probability that his conduct will cause severe emotional distress

113.    Defendant's actions inflicted emotional distress upon Plaintiffs.

4349960 v1 -

114.    Plaintiffs suffered damages as a result of Defendant's conduct.

WHEREFORE, Plaintiffs demand judgement in their favor and against Defendant, together with any and all compensatory and punitive damages, costs, fees, and attorneys' fees as allowed by law.

Dated:  March 30, 2022                    Respectfully submitted,

                                          BRYAN YOUNGE and  SHELBY YOUNGE


                                          _____/s/ Adam L. Gill_____
                                          One of its Attorneys

Counsel of Record:

Adam L. Gill (Attorney No. 6289577)
**Fox Swibel Levin & Carroll LLP**
200 West Madison Street, Suite 3000
Chicago, IL 60606
Office:  (312) 224-1200
agill@foxswibel.com

Of Counsel:

Kevin F. Berry
**Royer Cooper Cohen Braunfeld**
Two Logan Square
100 N. 18th Street, Suite 710
Philadelphia, PA 19103
Office: (267-546-0204)
Cell: (610-909-5410)
kberry@rccblaw.com
*Motion for Admission Pro Hac Vice, pending*